188 Ariz. 276 (1996)
935 P.2d 854
SOUTHEAST ARIZONA MEDICAL CENTER, an Arizona corporation, Plaintiff-Appellant,
v.
ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM ADMINISTRATION, an agency of the State of Arizona, Defendant-Appellee.
No. 1 CA-CV 95-0445.
Court of Appeals of Arizona, Division 1, Department C.
September 10, 1996.
Reconsideration Denied November 29, 1996.
Review Denied April 29, 1997.
*277 Johnston Maynard Grant and Parker, P.L.C. by Logan T. Johnston, Phoenix, for Defendant-Appellee.
Gammage & Burnham, P.L.C. by Curtis Ullman, Cameron C. Artigue, Richard B. Burnham, Phoenix, for Plaintiff-Appellant.
OPINION
EHRLICH, Judge.
Southeast Arizona Medical Center ("SAMC") appeals from the superior court's grant of partial summary judgment in favor of the Arizona Health Care Cost Containment System ("AHCCCS") Administration ("Administration") on SAMC's claim against the Administration for nonpayment of disproportionate-share payments and the court's dismissal of its negligence claim. For the reasons which follow, we reverse the partial summary judgment and the determination regarding the issue of negligence, and remand this matter for further proceedings.
FACTS AND PROCEDURAL HISTORY
The United States Congress established the Medicaid program in 1965 as an effort to furnish necessary medical services to disadvantaged persons. The State of Arizona participates in the Medicaid program through AHCCCS, the state agency designed to provide health-care services to the state's eligible population. Ariz. Rev. Stat. Ann. ("A.R.S.") § 36-2901 et seq. The AHCCCS program exists as a Medicaid demonstration project authorized by certain waivers from the federal government and monitored by the Health Care Finance Administration of the U.S. Department of Health and Human Services ("HCFA"). 42 U.S.C. § 1315.
In 1987, Congress began to provide disproportionate-share payments to hospitals serving a disproportionate share of low-income patients. Omnibus Budget Reconciliation Act of 1987, P.L. 100-203, sec. 4112, 101 Stat. 1330. By appropriating additional Medicaid funding to make disproportionate-share payments to qualifying hospitals, Congress intended to ameliorate the losses being suffered by hospitals treating an unusually high number of disadvantaged persons. 42 U.S.C. § 1396r-4. In 1991, Arizona began to participate in the disproportionate-share program. Laws 1991, 4th Sp.Sess., Ch. 3, § 1(B) (Dec. 17, 1991) ("Enactment of a disproportionate share program which has received federal approval shall be used as a means for improving reimbursement levels to hospitals."). The legislature assigned to the AHCCCS Administration the task of determining which hospitals qualified as ones entitled to share in the additional funds. A.R.S. § 36-2903.01(R) ("Notwithstanding any law to the contrary, on federal approval the administration may make disproportionate share payments to hospitals beginning October 1, 1991 in accordance with federal law and subject to legislative appropriation."). However, the legislature also made clear that, by participating in *278 the disproportionate-share-payment program, it was not obligating itself to appropriate state money. Laws 1991, 4th Sp.Sess., Ch. 3, § 1(C) ("If at any time federal monies used to make disproportionate share payments are denied or become unavailable for any reason, the state shall not be obligated to make any future appropriations from the state general fund for the purpose of making disproportionate share payments.").
AHCCCS customarily enrolls eligible persons in one of the private health plans or health-care-service organizations with which it contracts to provide care, such as Mercy Care Plan ("MCP") or Arizona Physicians IPA ("APIPA"), the plans involved in this case. The plans are responsible for either supplying the health-care services or for sub-contracting with health-care providers such as SAMC to provide the necessary care. A.R.S. § 36-2904. Subcontractors like SAMC remit claims and charges for plan-enrolled AHCCCS members to the plans for payment, not to AHCCCS. Ariz.Admin.Code ("A.A.C.") R9-22-705. The plans then seek payment from AHCCCS. However, the disproportionate-share program, because it provides funds directly to hospitals apart from service payments, operates somewhat differently.
The 1991 law provided that:
Disproportionate share payments made pursuant to this act for fiscal year 1991-1992 shall be computed based on information received by the [Administration] as of November 27, 1991.
1991 Sess.Laws, 4th Sp. Sess., Ch. 3, § 4. The requisite "information" was to be derived from "encounter data," which essentially consists of reports detailing the nature of and charges for health-care services provided to AHCCCS members.
AHCCCS, as the single state agency administering the plan, is charged by the HCFA with collecting encounter data as one of the HCFA's conditions of waiver for Arizona to proceed with its demonstration project. 42 U.S.C. § 1396a(a)(5); 42 C.F.R. §§ 431.107(b), 431.10(e); see 1990 State of Arizona  Arizona Health Care Cost Containment System  Request for Proposal ("Proposal Request") (Hearing Ex. 17). By federal regulation, the state plan must provide for an agreement between AHCCCS and "each provider or organization furnishing services under the plan in which the provider or organization agrees to: (1) Keep any records necessary to disclose the extent of services the provider furnishes to recipients;...." 42 C.F.R. § 431.107(b). See A.A.C. R9-22-507, R9-22-522.G. Among the purposes of encounter reporting is to gather facts to enable the HCFA and AHCCCS to evaluate the nature of given care, which would include the nature and number of services provided by hospitals for which AHCCCS payment is not sufficient and, thus, disproportionate-share funding is a necessary augmentation.
AHCCCS has significant control over how the encounter data is collected and detailed requirements pertaining to how the data is submitted. Indeed, so exact and numerous are the details that Section I(C)(2)(j)(10) of the Proposal Request specifies that there shall be on the staff of the contractor at least one "encounter processor to ensure the timely and accurate submission of encounter data reports." The providers submit the data to the plans, which, in turn, forward the data to the Administration, whereupon Article IV of the standard contract stipulates that the data "shall be deemed to be owned by AHCCCS." Sanctions may be assessed against any party in the clain for the failure to promptly and correctly transmit the data. In this case, it was not disputed and the Administration found that all of the encounter data submitted by SAMC was given to APIPA and MCP in a timely manner.
Under federal and Arizona law there are four accepted formulas for calculating a hospital's disproportionate-share eligibility and payment but only one of them, the federal "low-income-utilization" calculation, see 42 U.S.C. § 1396r-4(b), is involved here. Under that formula,[1] a hospital is eligible for a *279 disproportionate-share payment if its "low-income-utilization rate" exceeds 25 percent.
On December 18, 1991, SAMC wrote to the Administration expressing concern that SAMC apparently had not qualified for disproportionate-share payments. The Administration responded that, based on the data which the Administration had received as of November 27, 1991, SAMC was not qualified and, further, that, because the legislative cut-off date had passed, the Administration could not consider any alternative data offered by SAMC. SAMC then initiated a grievance before the Administration, challenging its "refusal to designate the hospital as a disproportionate share hospital."
In its "List of Witnesses and Exhibits" filed prior to the grievance hearing, SAMC gave the following "Summary of Issues":
Grievant asserts that it was entitled to participate in the Medicaid disproportionate share program for fiscal year 4/1/89-3/30/90 based upon its qualification in the low income utilization group. The agency improperly excluded grievant from the list of participating hospitals based upon a mistaken assessment of the Title XIX[[2]] and non-Title XIX revenues paid to the hospital during that fiscal year. In determining the hospital's eligibility, the agency relied upon charge and revenue figures which its representative has acknowledged were patently inaccurate. Based upon accurate figures for the time period in question, grievant was entitled to participate in the disproportionate share program. The agency's failure deprived the hospital of funds to which it was entitled pursuant to both federal and state statutes. The agency acted negligently in failing to recognize the hospital's eligibility for the program and the hospital is entitled to recover based upon the agency's negligence and the entitlement created by state and federal statutes.
Two witnesses were called at the November 10, 1992, hearing. The first to testify was Joan Agostinelli, the health-planning consultant who had designed the disproportionate-share program for AHCCCS. She said that, in early October 1991, she had requested a printout of SAMC's inpatient charges for AHCCCS members. The printout indicated that SAMC had no such charges, a fact Agostinelli knew to be incorrect. She then searched other data bases, including SAMC's Medicaid Cost Reports, to "roughly" determine if SAMC might qualify for a disproportionate-share payment. She concluded, however, that it probably would not qualify. Agostinelli also testified that, prior to the hearing, she requested another report of the SAMC data, this time seeking all data received as of November 27, 1991, the legislative cut-off date. Although this second printout yielded a much higher number of AHCCCS-member charges, the resulting low-income-utilization calculation resulted in a 19.49 percent low-income-utilization rate, more than five percent below the 25 percent qualifying limit.
The other witness was Carlton Ray McJenkins, SAMC's Assistant Administrator. He testified that SAMC's low-income-utilization rate was 26.26 percent.
Following the hearing, SAMC submitted a memorandum in which it argued that APIPA and MCP were the agents of the Administration with regard to the collection of the encounter data and that, as such, their receipt of the data from SAMC should constitute receipt by the Administration. SAMC also reiterated its argument that the plans and/or the Administration had been negligent in handling the encounter data. In its reply, the Administration objected to both arguments as untimely and unsupported but requested that, in the event that the hearing officer accepted either argument, the hearing be reopened to permit the Administration a chance to present contrary evidence. The *280 hearing officer granted the request to reopen, noting:
This Hearing Officer views the issue of agency to be relevant outside of the negligence context. However, since this issue was never clearly set forth until after the hearing, AHCCCS should be afforded an opportunity to pre-sent evidence on this issue; hence, the hearing will be reopened.
However, no testimony or evidence will be allowed as to the negligence issue. A review of the record in this matter shows the issue was adequately set forth by Grievant before the hearing, and at the hearing. AHCCCS had ample opportunity to present whatever evidence was necessary to rebut Grievant's negligence argument. Requesting that the hearing be reopened in this matter if I find Grievant made a prima facie case is improper. This determination not to reopen the hearing on the negligence issue does not reflect any determination as to the merits of Grievant's negligence argument, however. [Emphasis original.]
After the reopened hearing, held on February 26, 1993, and the submission of post-hearing memoranda, the hearing officer issued his decision recommending that SAMC be awarded its disproportionate-share payment. The hearing officer commented that SAMC was "factually entitled to disproportionate share payment for the relevant period, but for the question of whether this data was received by AHCCCS by November 27, 1991." He noted further that "[i]t is undisputed that all claims and data establishing the total charges incurred by MCP and APIPA patients... were timely submitted to MCP or APIPA." Finally, he addressed the arguments presented by SAMC "as to why AHCCCS should be found to have timely received the relevant encounter data." As to the first claim, that "AHCCCS actually received the data," the hearing officer held that, because SAMC presented "no evidence establishing that the plans did timely submit the encounter data to AHCCCS" and only offered testimony that AHCCCS "often loses claims," SAMC had "failed to meet its burden of proof in this regard."
SAMC's second argument was that APIPA and MCP were the "agents of AHCCCS, at least for the purposes of submitting encounter data, and therefore the receipt by MCP and APIPA of the data [should be] deemed receipt of the data by AHCCCS." Rejecting the Administration's counterargument that, by the terms of the contract between AHCCCS and the plans, the plans are independent contractors, the hearing officer determined that, based on "principles of implied agency, or agency by estoppel ... MCP and APIPA were the agents of AHCCCS for purposes of receiving encounter data." (Emphasis original.)
As for SAMC's final argument, that of AHCCCS's alleged negligence, the hearing officer held:
Finally, although negligence on the part of AHCCCS was alleged, it need [not] be discussed in light of the above rationale. However, it should be noted that despite AHCCCS' assertions that negligence was not raised by [SAMC] until after the hearing in this matter, this is incorrect. [SAMC's] List of Witnesses and Exhibits has a Summary of Issues section that clearly states AHCCCS acted negligently. This constitutes sufficient notice, and, therefore, despite AHCCCS' arguments to the contrary, reopening the hearing as to the negligence allegation was not warranted.
On appeal, the Administration Director reversed the hearing officer's determination that the plans were agents of the Administration. While concurring in the hearing officer's factual findings regarding SAMC's entitlement to the disproportionate-share payment and its timely submission of the encounter data to the plans, the Director ruled SAMC's agency argument to be without support. Rather, he concluded, referring to the contracts between the Administration and the plans, the plans were independent contractors and, thus, receipt of the encounter data by the plans could not be imputed to AHCCCS. The Director adopted the findings of fact and conclusions of law "not inconsistent with this Decision" and the decision was affirmed upon SAMC's petition for rehearing.
*281 One month later, SAMC filed the underlying complaint in the superior court. The complaint contained one count under the Administrative Review Act, A.R.S. section 12-901 et seq., and one count of negligence. SAMC moved for partial summary judgment on the administrative review claim but it specifically did "not address its other negligence and due process claims because an award of partial summary judgment in favor of the hospital would moot those other claims." Supporting its administrative-review claim, SAMC reurged its agency argument, as well as its contention that AHCCCS actually or constructively received the encounter data.
The Administration answered, rearguing its prior claim that the plans were independent contractors, not agents. As to SAMC's actual-receipt and constructive-receipt claims, the Administration said that the hearing officer had properly rejected the former for lack of evidence and it discounted the latter as predicated on a mistaken agency relationship.
The superior court affirmed the Director's decision, finding that it was "not arbitrary, capricious or an abuse of discretion." It upheld the Director's independent contractor determination based on Owen v. Creedon, 170 Ariz. 511, 512, 826 P.2d 808, 809 (App. 1992), wherein this court explained, first, that deference is due an agency's factual findings, unless unsupported by "substantial evidence" and, second, that, "[e]ven if two inconsistent factual conclusions could be supported by the record, there is substantial evidence to support an administrative decision that chooses either conclusion." The superior court further held that the evidence presented at the hearing did "not rise to the level of constructive receipt," and that the hearing officer and the Director correctly held that SAMC failed to meet its burden of proof with respect to the actual receipt of the encounter data.
SAMC objected to the superior court's essential dismissal of its complaint and its failure to address the negligence claim. The court agreed that "the parties had an opportunity to fully argue only the claim of judicial review of the administrative decision" and, therefore, ordered SAMC and the Administration to submit briefs on the following issue:
Whether [SAMC] can maintain an independent negligence claim against the administrative agency, in a complaint for judicial review of the administrative decision, when both claims arise out of similar operative facts.
The court also amended its prior minute entry nunc pro tunc to reflect the entry of partial summary judgment in favor of the Administration on the administrative review claim.
Subsequently the superior court ruled:
The Court of Appeals held that private claims by hospital providers which were "inextricably intertwined" with claims of nonpayment under the AHCCCS statutory scheme, must be brought to the agency for exhaustion of administrative remedies. St. Mary's Hosp. and Health Center v. State, 150 Ariz. 8, 10[sic], 721 P.2d 666, 669 (App. 1986). The Court of Appeals further held that a provider could assert any legal grounds to support their [sic] claim for payment before the administrative agency, and that those grounds would be reserved for action during judicial review. Id.

THE COURT FINDS that [SAMC's] negligence claim against [the Administration] is based on similar operative facts as its claim for payment that was heard through [the Administration's] administrative grievance process and considered by this Court through judicial review. Therefore,
IT IS ORDERED affirming the Court's June 17, 1994, minute entry and denying [SAMC's] appeal on all counts.
Upon denial of SAMC's motion for reconsideration, the superior court entered judgment against SAMC. This appeal followed.
DISCUSSION
A. Administrative-Review Claim
Whether substantial evidence supports an agency decision is a question of law. Havasu Heights Ranch and Development Corp. v. Desert Valley Wood Products, 167 Ariz. 383, 387, 807 P.2d 1119, 1123 (App. 1990). On appeal from an administrative determination, the appellate court is free to draw its own conclusions concerning such issues. Id.; Eshelman v. Blubaum, 114 *282 Ariz. 376, 378, 560 P.2d 1283, 1285 (App. 1977). Specifically, when, as is true in this case, material facts are not disputed, the existence of an agency relationship is a question of law, Sparks v. Republic Nat'l Life Ins. Co., 132 Ariz. 529, 542, 647 P.2d 1127, 1140 (1982), decided de novo. Eshelman, 114 Ariz. at 378, 560 P.2d at 1285.
We disagree with the conclusion reached by the Administration regarding the plans' status as independent contractors. While the encounter data submitted by plans to the Administration is used for a host of purposes other than determining disproportionate-share-program eligibility, the disproportionate-share-payment program is unique and, for this purpose at least, the plans are agents of the Administration.
In its most elemental terms, an agent is "one who acts on behalf of another." In the Matter of the Marital Trust under the John W. Murphey and Helen G. Murphey Trust, 169 Ariz. 443, 444, 819 P.2d 1029, 1030 (App. 1991). An independent contractor is one "who contracts with another to do something for [the other] but who is not controlled by the other nor subject to the other's right to control with respect to [the] physical conduct in the performance of the undertaking. He may or may not be an agent." RESTATEMENT (SECOND) OF AGENCY § 2(3) (1958). See RESTATEMENT (SECOND) OF AGENCY § 14N (1958) (independent contractor status and agency relationship not mutually exclusive). While the AHCCCS standard contract provides that the contractor is independent, the language of a contract is not controlling in determining the existence of an agency relationship; rather, we look to "the totality of the facts and circumstances of each case." Santiago v. Phoenix Newspapers, 164 Ariz. 505, 508, 794 P.2d 138, 141 (1990) (quoting Anton v. Industrial Comm'n, 141 Ariz. 566, 568, 688 P.2d 192, 194 (App. 1984)).
The disproportionate-share program is one of federal control. The state is a participant in a national policy which results in additional funding for the direct benefit of and payment to qualifying hospitals because those hospitals treat a greater percentage of disadvantaged persons than do other facilities, and it is considered beneficial to assist and encourage those hospitals with supplemental money. Thus, the disproportionate-share program is completely unlike an AHCCCS payment to a plan for services rendered to an AHCCCS member by a subcontracting provider, such as a hospital. Separately, the HCFA has delegated its responsibility of identifying hospitals qualifying as recipients of disproportionate-share payments to AHCCCS. AHCCCS, in turn, utilizes encounter data, which already must be collected for a number of purposes having to do with the evaluation of AHCCCS apart from the administration of the plans, as a factor in computing the low-income-utilization formula. In this regard, then, the plans, which are obliged to gather encounter data for other uses, serve only as transmittal agents of the data between a hospital seeking qualification as a disproportionate-share hospital and the Administration. It is worth quoting in this context from J.K. v. Dillenberg, 836 F. Supp. 694, 699 (D.Ariz. 1993): "It is patently unreasonable to presume that Congress would permit a state to disclaim federal responsibilities by contracting away its obligations to a private entity."
B. Negligence Claim
Although the superior court was correct in finding that SAMC's "negligence claim against [the Administration] is based on similar operative facts as its claim for payment," it incorrectly concluded that the claim "was heard through [the Administration's] administrative grievance process and considered by this Court through judicial review." The fact is that the negligence claim never was fully litigated. There was little, if any, discovery on this issue and, in fact, the hearing officer specifically determined that he need not reach the negligence claim because he had decided that SAMC's implied-agency argument was meritorious. In reviewing the recommended decision, the Director reversed only the hearing officer's "agency" determination and otherwise affirmed the hearing officer's findings of fact and conclusions of law. Thus, although the claim of negligence was presented to the Administration, it was never argued or ruled on by the agency.
Nor did the superior court consider the negligence claim. The court requested briefing *283 on "[w]hether [SAMC] can maintain an independent negligence claim against the administrative agency, in a complaint for judicial review of the administrative decision, when both claims arise out of similar operative facts." Its own words, not to mention the contents of the briefs submitted by the parties on this question, indicate that the court was not considering the merits of the negligence claim; it simply was deciding if it could hear the claim in the first place. The court's subsequent ruling, predicated on its interpretation of the opinion in St. Mary's, was in error.
While SAMC's negligence claim was "inextricably intertwined" with its administrative-review claim, the fact remains that SAMC properly presented to, but did not receive a ruling from, the Administration on its negligence claim. The court in St. Mary's was quite clear:
The providers can assert any legal grounds they feel appropriate to support payment of their claims by the state through the administrative process and reserve those grounds for action by the court when judicial review is taken from a final decision of the director.
150 Ariz. at 10, 721 P.2d at 668 (emphasis added).
The hearing officer confirmed that the negligence claim had been presented to the Administration. Having done so, SAMC properly "reserved" that claim "for action by" the superior court. This did not occur and SAMC is entitled to litigate its negligence claim before the superior court.
CONCLUSION
For the reasons stated above, we reverse the superior court's grant of partial summary judgment regarding the administrative-review claim, reverse as to the court's determination on the negligence claim, and remand for further proceedings consistent with this opinion.
CONTRERAS, P.J., and THOMPSON, J., concur.
NOTES
[1] The low-income-utilization formula is as follows:
 A + B + C E
 _________ + _
 D + C F
 A = Medicaid (Title XIX) Inpatient Revenues
 Paid
 B = State Subsidies Paid
 C = Local Government Subsidies Paid
 D = Total Net Revenues of Hospital for Inpatient
 Services
 E = Total Charity Care Charges
 F = Total Gross Inpatient Revenues

[2] "Title XIX" refers to that title of the Social Security Act, 42 U.S.C. § 1396a (1980). See A.R.S. § 36-2901(4)(b).